# Illinois Official Reports

## Supreme Court

---

### *People v. Manzo*, 2018 IL 122761

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JORGE MANZO JR., Appellant. |
| Docket No. | 122761 |
| Filed | December 28, 2018 |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Will County, the Hon. Edward A. Burmila Jr., Judge, presiding. |
| Judgment | Judgments reversed. <br> Cause remanded. |
| Counsel on Appeal | James E. Chadd, State Appellate Defender, Peter A. Carusona, Deputy Defender, and Editha Rosario-Moore, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Ottawa, for appellant. <br><br> Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Michael M. Glick and Leah M. Bendik, Assistant Attorneys General, of Chicago, of counsel), for the People. |

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Justices Kilbride, Theis, and Neville concurred in the judgment and opinion.

Justice Garman dissented, with opinion, joined by Chief Justice Karmeier and Justice Burke.


## OPINION

¶ 1       The defendant, Jorge Manzo Jr., was charged with unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(B) (West 2008)) and unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2008)) following a search of his residence pursuant to warrant. Prior to trial, defendant filed a motion to quash the search warrant and suppress evidence on the ground that there was no probable cause to search his residence. The circuit court of Will County denied defendant's motion. Following a jury trial, defendant was found guilty of unlawful possession of a weapon by a felon but was acquitted of unlawful possession of a controlled substance with intent to deliver. Defendant was sentenced to 36 months' intensive probation.

¶ 2       On appeal, defendant again argued that the circuit court erred in finding probable cause to search his residence. The Appellate Court, Third District, affirmed, with one justice dissenting. 2017 IL App (3d) 150264. This court then allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2017).

¶ 3                              BACKGROUND

¶ 4       On June 11, 2009, Officer Jeremy Harrison of the Joliet Police Department filed a sworn complaint for a search warrant to search the person of Ruben Casillas, as well as a black Ford Explorer and the premises located at 701 West Marion Street, Joliet, Illinois. The complaint for a search warrant did not target defendant, but 701 West Marion Street was defendant's residence. Defendant lived at 701 West Marion Street with Leticia Hernandez, his then girlfriend and later his wife. Casillas was Hernandez's cousin. Officer Harrison requested the search warrant for the purpose of seizing cocaine, United States currency including official advanced funds, proof of residency, proof of identification, drug records, drug packaging, drug paraphernalia, and any other evidence of the crimes of unlawful possession of a controlled substance and unlawful possession of a controlled substance with the intent to deliver.

¶ 5       In support of the complaint for a search warrant, Officer Harrison stated that he had probable cause to believe that the listed items were located upon Casillas or the property. Officer Harrison explained that he had purchased cocaine from Casillas three times over the past 20 days[1] and two of those purchases occurred in the vicinity of 701 West Marion Street.

---

[1]Although the complaint states that Officer Harrison had purchased cocaine from Casillas three times over 20 days, the dates referenced in the complaint indicate that the purchases occurred over 19 days.

¶ 6		On May 20, 2009, Harrison placed an outgoing telephone call and spoke with Casillas about purchasing $150 of cocaine. Casillas directed Harrison to meet him at the Gonzalez Supermarket, at 652 Collins Street, Joliet, Illinois. At the supermarket, Harrison observed Casillas walking away from a black Ford Explorer. Casillas motioned for Harrison to come inside the store. Casillas placed a clear plastic bag containing suspected cocaine onto a store shelf and told Harrison that it was right there. Harrison retrieved the bag and handed Casillas $150 in United States currency. Officer Simonich watched Casillas exit the store and reenter the black Ford Explorer. Harrison conducted a field test on the substance in the plastic bag, which was positive for the presumptive presence of cocaine. The suspected cocaine weighed 3.7 grams. Harrison checked the registration on the black Ford Explorer and determined that it was registered to Leticia Hernandez at 701 West Marion Street in Joliet.

¶ 7		On May 28, 2009, Harrison made a series of telephone calls and text messages to purchase $300 worth of cocaine from Casillas. Casillas directed Harrison to meet him inside Stang Kelly Liquor Store located at 712 West Jefferson Street in Joliet. Harrison met Casillas in an aisle inside the liquor store. Casillas pointed toward some liquor bottles on a store shelf and said, "they are right there." Harrison retrieved two clear plastic bags containing suspected cocaine and handed Casillas $300 in United States currency. A field test was positive for the presumptive presence of cocaine. The suspected cocaine weighed 7.9 grams.

¶ 8		On June 8, 2009, Harrison sent a series of text messages to Casillas about purchasing $150 of cocaine. While Harrison was texting Casillas, Officers Simonich and Prochaska conducted surveillance on 701 West Marion Street. Casillas directed Harrison to meet him at Stang Kelly Liquors again. Officer Simonich observed Casillas exit the residence at 701 West Marion Street on foot. Officer Prochaska conducted uninterrupted surveillance of Casillas as he walked to meet Officer Harrison. While Casillas was walking, he directed Officer Harrison to meet him inside the Martinez grocery store located at 704 West Jefferson Street, Joliet, rather than at Stang Kelly Liquors. Harrison proceeded to the store and met Casillas in an aisle. Casillas pointed to a store shelf and said, "it's right there." Harrison retrieved a clear plastic Baggie containing suspected cocaine from the shelf and handed Casillas $150 in United States currency. A field test indicated that the suspected cocaine, which weighed 3.6 grams, had a positive reaction for the presumptive presence of cocaine.

¶ 9		Harrison's complaint for a search warrant stated that he had positively identified Casillas from an Illinois Secretary of State driver's license photograph. In addition, Harrison stated that law enforcement records showed that Casillas was an associate of Leticia Hernandez who resided at 701 West Marion Street in Joliet.

¶ 10		The warrant judge issued the warrant the same day the complaint was filed. The search warrant was executed the next day, June 12, 2009. Officers seized several items from 701 West Marion Street, including a bag containing 348 grams of cocaine, a handgun, ammunition, a digital scale, a box of plastic bags, over $9000 in United States currency, and proof of residency for both defendant and Casillas. The cocaine, the handgun, the ammunition, the digital scale, and the box of plastic bags were found in a safe inside the master bedroom closet. The cash was found in the pockets of two jackets in the master bedroom closet. Defendant's proof of residency at 701 West Marion Street was found in a bedroom drawer and elsewhere in the house. None of the paperwork concerning Casillas's residency indicated that 701 West Marion Street address was Casillas's address.

¶ 11    Prior to trial, defendant filed a motion to quash arrest and suppress evidence, arguing that the officers lacked probable cause to search his home. The motion argued that, prior to the execution of the search warrant, no corroborating information was sought or found by the responding police officers to verify that Casillas ever resided at 701 West Marion Street. Further, Officer Harrison ran Casillas's driver's license information, which showed that Casillas was not a legal resident of 701 West Marion Street, nor did Casillas use that address as his address. Defendant also argued that, although there were three alleged drug transactions committed by Casillas, none of the transactions took place at 701 West Marion Street. Further, although the warrant indicated that the officers saw Casillas walk out of 701 West Marion Street on one occasion, the officers did not verify whether Casillas actually resided there or was just a casual visitor. No information was provided concerning how long Casillas was at the residence prior to meeting Officer Harrison.

¶ 12    Defendant contended that Officer Harrison, who supplied the information for the search warrant, was only aware that Casillas was in possession of contraband on three separate occasions. No contraband or illegal activity was observed at 701 West Marion Street, indicating that Officer Harrison never corroborated that Casillas was selling illegal contraband from 701 West Marion Street or that illegal activity was being conducted at that location. The only activity that responding officers corroborated was that Casillas was conducting illegal drug activity away from the residence. Consequently, the four corners of the search warrant completely lacked sufficient probable cause to conduct the search that led to defendant's arrest and to the seizure of certain items of purported evidence. For that reason, defendant argued that the seizure of property at defendant's residence violated defendant's rights and should be excluded from evidence.

¶ 13    In response, the State noted that defendant's entire argument rested on the allegation that Casillas, the subject of the search warrant, was not a resident of 701 West Marion Street and that Harrison should have known that. The State argued that there is no requirement that the subject of a search warrant reside at the address to be searched, nor that the suspect have legally changed his address or driver's license to include that address. The State contended that there was sufficient probable cause to obtain a search warrant based on the facts relating to 701 West Marion Street set forth by Officer Harrison in his complaint. Casillas was driving a car registered to Leticia Hernandez at 701 West Marion Street at the time Casillas sold narcotics to Harrison on May 20, 2009. On June 8, 2009, Officer Harrison sent and received text messages from Casillas about purchasing cocaine, while officers conducting surveillance observed Casillas exit the residence at 701 West Marion Street and walk to the location where Casillas exchanged cocaine with Officer Harrison for United States currency. The officers conducting surveillance never lost sight of Casillas during his walk. The State argued that, based on all the facts contained within the four corners of the search warrant and the complaint for a search warrant, probable cause existed for the search of the residence located at 701 West Marion Street. In the alternative, the State argued that, even if the court determined that the warrant was invalid, the evidence should nonetheless be admitted under the good faith exception to the exclusionary rule.

¶ 14    Multiple hearings were held on defendant's motion to quash in the trial court. The trial court initially entered an order finding that defendant met his burden of showing by a preponderance of the evidence that the affidavit for the warrant was misleading and was presented with a disregard for its truthfulness and that the misleading statement was germane

to the probable cause finding. Specifically, the trial court found the following statements misleading: that Casillas had been positively identified from his Illinois Secretary of State driver's license and that "law enforcement records show Ruben J. Casillas as an associate of Leticia Hernandez who resides at 701 West Marion St., Joliet, Will County, Illinois." The trial court believed the preceding statements may have misled the warrant judge into thinking that Casillas lived at 701 West Marion Street.

¶ 15    At a subsequent hearing, the trial court stated that, since he had found the magistrate was misled, the State could present case law and evidence concerning whether the misleading was "advertent or inadvertent." The State then filed a motion seeking clarification of the court's order, arguing that it was unclear whether the trial court had found on its own that the warrant was misleading and had ordered a *Franks* hearing or whether the court instead had ordered a good faith hearing.[2]

¶ 16    Following further hearings, the trial court stated that there would be no *Franks* hearing and that defendant had met his burden to show that the warrant misled the magistrate, so that the burden shifted to the State. The State later provided the court with an affidavit from the magistrate attesting that he did not interpret the statement about Casillas and Hernandez to mean that Casillas lived at the residence but rather understood it to mean that Hernandez lived at the residence and Casillas was her associate.

¶ 17    The trial court subsequently issued an order finding that defendant had met his burden of showing by a preponderance of the evidence that the affidavit for the warrant was misleading and was presented with a disregard for its truthfulness. The trial court also held that the misleading statement was germane to the probable cause finding. The trial court then ordered a hearing with the onus on the State to determine whether the affiant officer had acted intentionally, with reckless disregard, or with inadvertence.

¶ 18    The State then filed a motion to reconsider, arguing that the misleading statement was not material and that the remainder of the warrant established a sufficient nexus between Casillas and the residence. The trial court subsequently granted the State's motion to reconsider, stating that, "taking the misleading information from the search warrant, the remaining information allowed for a reasonable inference that there was a fair probability that evidence would be found at the particular place to be searched."

¶ 19    The trial court thereafter denied defendant's first amended motion to reconsider. At the hearing on defendant's motion, the trial court clarified that its original ruling had relied upon the assumption that it was necessary to establish that the residence was the target's home. The trial court also stated that, because Casillas was seen leaving defendant's house before the third drug buy, it was reasonable to infer that there was a fair probability that drugs would be found at defendant's home. The trial court found that the search warrant established a reasonable likelihood that contraband would be found in defendant's home.

---

[2]In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the Court held that, where a "defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and that statement is necessary to a probable cause finding, a hearing must be held, upon the defendant's request, pursuant to the fourth amendment.

¶ 20    Following a jury trial, defendant was found guilty of unlawful possession of a weapon by a felon but was found not guilty of unlawful possession of a controlled substance with intent to deliver.

¶ 21    The appellate court, with one justice dissenting, affirmed. 2017 IL App (3d) 150264. As in the trial court, defendant argued on appeal that the complaint for a search warrant did not establish probable cause because it failed to show a nexus between Casillas's illegal activities and defendant's residence. In affirming the trial court, the appellate court majority noted that if there is no direct information to establish a nexus between the criminal offense, the items to be seized, and the place to be searched, the court may draw reasonable inferences to create the nexus. *Id.* ¶ 17. The majority found the information in the affidavit sufficiently connected Casillas's drug activity to defendant's residence where it showed that the officers observed Casillas leave defendant's home while communicating with Harrison to set up an imminent drug transaction and also observed Casillas walk from the residence to the location of the drug transaction. *Id.* ¶ 18. During a different transaction, Casillas was seen using a black Ford Explorer registered to defendant's residence. *Id.* Although the affidavit lacked any information that showed Casillas resided at the residence, the majority stated that such information was not necessary. *Id.*

¶ 22    The dissenting justice disagreed that the warrant judge had a substantial basis for finding probable cause to believe that Casillas's illegal activities would be found in defendant's residence. The only two allegations in the complaint for a search warrant that had any reference to the residence in question were that Casillas used Leticia Hernandez's vehicle to arrive at one of the transactions and that Casillas was seen leaving the residence prior to one of the three transactions. *Id.* ¶ 28 (O'Brien, J., dissenting). According to the dissent, noticeably absent from the complaint were any allegations that Casillas lived in the residence, stored narcotics in the residence, or conducted any drug transactions inside the residence. *Id.* The dissent stated that, at best, the complaint established that Casillas was an acquaintance of the owners of the residence but did not establish a nexus to believe that evidence of Casillas's illegal activities would be found in the residence. *Id.* The dissent therefore would find that the complaint for the search warrant failed to provide the warrant judge with a substantial basis to find probable cause to search defendant's residence. *Id.*

¶ 23                                    ANALYSIS

¶ 24    In this court, defendant again argues that Officer Harrison's complaint for a search warrant failed to establish probable cause to search defendant's home. Defendant maintains that the totality of circumstances did not establish a fair probability that evidence of Casillas's drug dealing would be found in defendant's home. Therefore, the trial court erred in denying defendant's motion to quash arrest and suppress evidence.

¶ 25    A circuit court's ruling on a motion to suppress presents questions of both fact and law. *People v. McCarty*, 223 Ill. 2d 109, 148 (2006). A circuit court's finding of fact is given deference when ruling on a motion to suppress and will be reversed only when those findings of fact are against the manifest weight of the evidence. *People v. Burns*, 2016 IL 118973, ¶ 15. If the reviewing court accepts the trial court's factual findings, it conducts a *de novo* review of whether suppression was appropriate under those facts. *People v. Lampitok*, 207 Ill. 2d 231, 240 (2003).

¶ 26    The fourth amendment to the United States Constitution, made applicable to state officials through the fourteenth amendment to the United States Constitution, provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

See also *Elkins v. United States*, 364 U.S. 206, 213 (1960) (fourth amendment prohibition is applicable to state officials through the fourteenth amendment).

¶ 27    Similarly, the search and seizure clause of the Illinois Constitution provides:

> "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

¶ 28    With a narrow exception not relevant in this case (see *People v. Krueger*, 175 Ill. 2d 60 (1996)), this court has held that the search and seizure provision in article I, section 6, of the Illinois Constitution is to be interpreted in lockstep with the fourth amendment. See *People v. Tisler*, 103 Ill. 2d 226, 245 (1984)). The fourth amendment and the Illinois search and seizure clause, then, both set forth two underlying requirements: that searches and seizures must be reasonable and that probable cause must support search warrants. *People v. Carlson*, 185 Ill. 2d 546, 553 (1999).

¶ 29    As noted, defendant argues that there was insufficient probable cause to support the search of his home in this case. Pursuant to federal and state warrant requirements, a detached judicial officer must resolve the question of whether probable cause exists to justify issuing a warrant. *Tisler*, 103 Ill. 2d at 236. Whether probable cause exists in a particular case turns on the " 'totality of the circumstances and facts known to the officers and court when the warrant is applied for.' " *Id.* (quoting *People v. Free*, 94 Ill. 2d 378, 400 (1983)). Accordingly, probable cause exists in a particular case when the totality of the facts and circumstances within the affiant's knowledge at the time the warrant is applied for "was sufficient to warrant a person of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched." *People v. Griffin*, 178 Ill. 2d 65, 77 (1997). It is the probability of criminal activity, rather than proof beyond a reasonable doubt, that is the standard for determining whether probable cause is present. *Tisler*, 103 Ill. 2d at 236.

¶ 30    Whether the necessary probability exists is governed by commonsense considerations that are factual and practical, rather than by technical rules. *Id.* As the United States Supreme Court explained in *Illinois v. Gates*, 462 U.S. 213, 238 (1983):

> "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

¶ 31    A reviewing court must not substitute its judgment for that of the magistrate in construing an affidavit but must instead merely decide whether the magistrate had a substantial basis for

concluding that probable cause existed. *McCarty*, 223 Ill. 2d at 153. The court's review must not be tainted by hindsight but instead should be based upon whether " 'a reasonable and prudent man, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense.' " *Tisler*, 103 Ill. 2d at 237 (quoting *People v. Wright*, 41 Ill. 2d 170, 174 (1968)). Moreover, in determining whether an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases should largely be determined by the preference to be accorded to the warrants. *People v. Stewart*, 104 Ill. 2d 463, 477 (1984).

¶ 32    A sworn complaint supporting a search warrant is presumed valid. *McCarty*, 223 Ill. 2d at 154. Defendant has not challenged the veracity of Officer Harrison's statements in the complaint, so we view those statements as true for purposes of this appeal.

¶ 33    With the preceding legal standards in mind, we now turn to the facts of this case. Defendant argues that the dissenting justice in the appellate court was correct that there was no probable cause to search defendant's home because the totality of circumstances did not establish a fair probability that evidence of Casillas's drug dealing would be found in defendant's home. Defendant points out that there was no direct evidence that criminal activity was occurring in defendant's home, as there were no observations that Casillas was dealing drugs from the home, and defendant was not the target of the search. Defendant contends that, in the absence of direct information, the warrant application must establish a nexus or connection between the criminal offense, the items to be seized, and the place to be searched. Defendant asserts that any such nexus was missing in this case, given the absence of facts connecting Casillas's criminal activity to defendant's home. Defendant claims that a person's simple presence in a home, for an undetermined amount of time before conducting a drug transaction in public, does not establish a fair probability that criminal activity was ongoing in the home. Defendant states that this is particularly true given that the home is afforded the highest protection under fourth amendment jurisprudence.

¶ 34    The State responds that, under the applicable deferential standard of review, the information in Officer Harrison's affidavit, along with the inferences reasonably drawn therefrom, established a substantial basis to conclude that there was a fair probability that contraband or evidence of illegal drug activity would be found at defendant's home. Consequently, the State concludes that the totality of circumstances, including the evidence and reasonable inferences from that evidence, provided the magistrate with a substantial basis to determine that there was a fair probability that evidence of Casillas's drug dealing would be found at 701 West Marion Street, so that the trial court properly denied defendant's motion to suppress.

¶ 35    Defendant is correct that the "chief evil" deterred by the fourth amendment is the physical invasion of the home. *Payton v. New York*, 445 U.S. 573, 585-86 (1980). The home is the first among equals under the fourth amendment. *Burns*, 2016 IL 118973, ¶ 24. In fact, the right of a citizen to retreat into the home and " 'there be free from unreasonable governmental intrusion' " stands at the core of the fourth amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). With regard to the search of an individual's home, "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is

sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). As stated by the Court of Appeals for the Sixth Circuit, " '[t]here must be, in other words, a *nexus* between the place to be searched and the evidence sought.' " (Emphasis in original.) *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (*en banc*)). Stated otherwise, a warrant application "must give someone of 'reasonable caution' reason to believe that evidence of a crime will be found at the place to be searched." *United States v. Ribeiro*, 397 F.3d 43, 49 (1st Cir. 2005). To that end, sufficient information must be presented to the magistrate to allow the magistrate to determine probable cause, as his action cannot be a mere ratification of the bare conclusions of others. *Gates*, 462 U.S. at 239.

¶ 36    Keeping in mind that a magistrate may draw "reasonable inferences" from the information given in a search warrant application and that doubtful or marginal cases should be determined by the preference to be accorded warrants, we nonetheless find that the facts in Officer Harrison's sworn complaint, and the inferences drawn therefrom, did not provide the magistrate in this case with probable cause to issue the search warrant for defendant's home.

¶ 37    Here, the facts Officer Harrison recited in support of his claim that he had probable cause to believe the items sought in the search warrant would be located at 701 West Marion Street included the following: two of the three drug buys conducted over a period of 20[3] days occurred in the vicinity of 701 West Marion Street; Casillas arrived at the location of the first drug buy in a vehicle registered to Leticia Hernandez at 701 West Marion Street; while Officer Harrison was texting Casillas about the third drug buy, Officers Simonich and Prochaska conducted surveillance on 701 West Marion Street and observed Casillas exit the residence and walk to the grocery store where he met Officer Harrison and exchanged 3.6 grams of cocaine for $150 in cash; Casillas had been positively identified from an Illinois Secretary of State driver's license photograph; and law enforcement records showed that Casillas was an associate of Leticia Hernandez who resides at 701 West Marion Street.

¶ 38    The circuit court found probable cause based upon the fact that Casillas was seen leaving defendant's house before the third drug buy. The appellate court found probable cause based on the fact that Casillas used a vehicle registered to defendant's residence to drive to the first drug transaction and the fact that Casillas was seen leaving defendant's home while communicating with Officer Harrison to set up a drug transaction and walked from defendant's residence to that transaction.

¶ 39    Contrary to the lower courts, we find those facts fail to establish a sufficient nexus between Casillas's criminal activities and the residence at 701 West Marion Street. Although the complaint for a search warrant stated that law enforcement records showed that Casillas was an "associate" of Hernandez, the connection between Casillas and Hernandez was not further explained, and the statement on its own did not create an inference that Casillas and Hernandez were involved in drug dealing or drug trafficking together, let alone that Casillas was storing evidence of drug dealing at defendant's home. There was nothing in the complaint connecting Leticia Hernandez to Casillas's illegal activities. There was no further discussion of Hernandez in the complaint, particularly any evidence that Hernandez had ever been suspected of, arrested for, or charged with any crime, much less a drug-related offense. Indeed, there was no information in the complaint concerning whether Casillas himself had a prior criminal history.

---

[3]As noted above, it was a period of 19 days.

There was nothing in the complaint indicating that Casillas had ever been arrested for, or convicted of, a drug-related offense or had been involved in drug dealing prior to his three transactions with Officer Harrison.

¶ 40   The State claims that the fact that Hernandez allowed Casillas to drive her vehicle suggests that Casillas was more than a casual acquaintance, so that the relationship between Hernandez and Casillas supports an inference that it was fairly probable that Casillas would hide evidence at the residence that defendant shared with Hernandez. We do not agree that such an inference flows from the fact that Casillas drove to one drug deal in Hernandez's vehicle. There was no evidence that Casillas regularly used Hernandez's vehicle or that Casillas used the vehicle more than the one time described in the complaint. There is no evidence indicating where Casillas was before arriving at the drug deal in Hernandez's vehicle. In particular, there was no evidence that Casillas drove Hernandez's vehicle directly from defendant's home to meet Officer Harrison.

¶ 41   At best, the totality of facts and circumstances in the sworn complaint creates an inference connecting Hernandez's vehicle to the drug sale, but it fails to further connect defendant's home to the drug sale. The fact that an alleged drug dealer drives another individual's car to one drug deal does not create an inference that the vehicle's owner has contraband in his or her home and does not justify a search of the vehicle owner's home. To hold otherwise could expose virtually any innocent third party to a search of the home. Such a result would be entirely at odds with the protections accorded an individual's home under the fourth amendment.

¶ 42   The State also argues that, because the second and third drug sales took place at businesses within a five-minute and three-minute walk of 701 West Marion Street, it was reasonable to infer that Casillas was familiar with the neighborhood around 701 West Marion Street. Therefore, the State claims that it was reasonable to infer that 701 West Marion Street was a logical and convenient place for Casillas to store and access his drug supply and his tools of drug dealing.

¶ 43   Here too, we do not agree with the State that an inference arises based upon the location of the two drug sales *vis-à-vis* defendant's home. No evidence was presented that defendant lived at 701 West Marion Street, nor was there evidence that Casillas was a frequent visitor to 701 West Marion Street. Casillas was seen at 701 West Marion Street one time. The affidavit did not specify defendant's legal address, although the complaint stated that Officer Harrison had identified Casillas from his Illinois Secretary of State driver's license. It is possible Casillas also lived in the neighborhood and, for that reason, was familiar with the area.

¶ 44   In addition, with regard to the second sale, the sworn complaint contains no information describing whether Casillas walked or drove to that sale, nor does the complaint describe where Casillas had been immediately prior to that sale. Absent such information, we find no basis for the State's inference finding significance based upon the proximity of the second sale to defendant's home. In any event, that Casillas conducted two drug sales in the vicinity of, but not at, 701 West Marion Street, and may have been familiar with the area, does not give rise to an inference that Casillas would store his contraband in defendant's home, as opposed to any other home in the vicinity of the drug sales.

¶ 45   In this regard, we agree with the court in *United States v. Rowland*, 145 F.3d 1194, 1205 (10th Cir. 1998), which found that an "affidavit [that] provide[s] no basis to either limit the

- 10 -

possible sites or suggest that [the suspect's] home was more likely than the otherwise endless possibilities" is "insufficient to provide a substantial basis for concluding there was probable cause to believe the contraband would be in [the suspect's] home at the time the search was to take place."

¶ 46    Here, the information set forth in the sworn complaint fails to connect defendant's home to Casillas's drug sales. Therefore, the complaint does not create a nexus between the specific items listed in the complaint for a search warrant and defendant's home sufficient to support a finding of probable cause to issue the search warrant.

¶ 47    The State also argues that the fact that Casillas left 701 West Marion Street to complete the third drug sale supports an inference that it is likely that Casillas possessed the drugs at 701 West Marion Street and also supports an inference that Casillas's drug supply and other tools of drug dealing were stored there.

¶ 48    Again, we disagree that any such inferences flow from the evidence in the affidavit. Casillas went to one of three drug sales from defendant's home. The three drug sales took place over a period of 19 days. With regard to the third drug sale, there was no evidence indicating how long Casillas had been at defendant's home before he left the home and walked to the drug sale. While Casillas apparently had the drugs on his person when he left 701 West Marion Street to meet Officer Harrison for the third drug sale, it does not follow that Casillas obtained those drugs from defendant's home as opposed to any other place. Without more information connecting defendant's home to the drug sale, it is equally possible to infer that Casillas had the drugs on his person when he arrived at defendant's home.

¶ 49    We particularly note that, although the State references Casillas's drug supply and other tools of drug dealing, the complaint for a search warrant set forth no facts to establish or infer that Casillas had a "drug supply" or other tools of drug dealing or that such items might be found at defendant's home. Again, the complaint for a search warrant simply described three drug sales from Casillas to Officer Harrison over a period of 19 days, then stated that Officer Harrison believed probable cause existed for issuance of a search warrant in order to seize "cocaine, United States currency, including official advanced funds, proof of residency, proof of identification, drug records, drug packaging, drug paraphernalia and any other evidence of the crimes of unlawful possession of a controlled substance and unlawful possession of a controlled substance with intent to deliver." The complaint for a search warrant failed to supply the necessary nexus between defendant's home and the evidence sought in the complaint.

¶ 50    The State also notes that each of Casillas's deliveries to Officer Harrison occurred on the same day as the order. The State infers from this that a drug dealer's ability to produce drugs soon after receiving a request for them suggests he has a ready supply and that a drug dealer who has participated in multiple drug sales is far likelier to have access to large quantities of drugs and other tools of the trade. The State suggests it is likely that Casillas stored his drugs in defendant's home, citing cases recognizing that dealers sometimes use "stash" houses to store drugs and related items.

¶ 51    Here too, the State's inferences are not supported by the evidence. As the Sixth Circuit Court of Appeals has recognized, the sale of drugs out of a residence "exists upon a continuum ranging from an individual who effectuates the occasional sale from his or her personal holdings of drugs to known acquaintances, to an organized group operating an established and notorious drug den." *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006). The facts and

inferences as set forth in Officer Harrison's sworn complaint were more suggestive of an occasional sale than a full-scale drug operation, much less a drug operation run out of defendant's home. There was no allegation in the complaint that the amount of drugs sold to Officer Harrison was indicative of a large-scale drug operation, nor was there an allegation that Casillas was a known drug dealer. Even assuming Casillas had access to a ready supply of drugs, the sworn complaint fails to create a nexus between defendant's home and that supply. There certainly was no evidence in the sworn complaint supporting an inference that defendant's home was a "stash house." As Justice O'Brien observed in her dissent:

> "Noticeably absent from the complaint are any allegations that Casillas lived in the residence, stored the narcotics in the residence, or conducted any drug transactions inside the residence. The three alleged transactions occurred over a period of 19 days (May 5 to June 8, 2009). At best, the complaint established that Casillas was an acquaintance of the owners of the residence. It did not establish a nexus to believe evidence of Casillas's illegal activities would be found in the residence." 2017 IL App (3d) 150264, ¶ 28 (O'Brien, J., dissenting).

¶ 52    We note that in its brief, the State cites extensive case law in support of the inferences it draws between Casillas's behavior and defendant's home. For example, the State cites case law stating a drug dealer's ability to produce drugs soon after receiving a request for them suggests he has a ready supply (*Commonwealth v. Clagon*, 987 N.E.2d 554 (Mass. 2013)); a dealer who has participated in multiple drug sales is far likelier to store or have access to large quantities of drugs and other tools of the drug trade (*Sowers v. Commonwealth*, 643 S.E.2d 506 (Va. Ct. App. 2007)); dealers sometimes use "stash houses" to store drugs and related items (*United States v. Garcia-Villalba*, 585 F.3d 1223 (9th Cir. 2009)); and the fact that a dealer leaves his home to complete a drug sale makes it more likely that he possessed drugs at his home (*United States v. Aguirre*, 664 F.3d 606 (5th Cir. 2011); *United States v. Montes-Medina*, 570 F.3d 1052 (8th Cir. 2009); *United States v. Dessesaure*, 429 F.3d 359 (1st Cir. 2005); *State v. Saine*, 297 S.W.3d 199 (Tenn. 2009); *Holmes v. State*, 796 A.2d 90 (Md. 2002)).

¶ 53    While we agree that the preceding inferences may follow in a particular case based upon the facts set forth in a complaint for a search warrant, we find that those inferences do not follow from the facts presented in the complaint for a search warrant in this case. Aside from setting forth the general statements in the cited cases, the State fails to demonstrate that the facts in those cases are analogous to the facts in the instant case. They are not. Notably, in the cases cited by the State, the search warrants at issue contained some evidence creating an inference that the items to be seized would be found at the residence to be searched.

¶ 54    For example, in *Clagon*, the affiant officer described his experience in drug investigations and arrests, attesting "that he was familiar with drug distribution tactics, such as a delivery service whereby a distributor conceals a supply of controlled substances at his residence and conducts sales to individual buyers at other locations." 987 N.E.2d at 555-56. The affidavit in *Clagon* also suggested the defendant was an established drug dealer with an ongoing, regular trade, which was corroborated by controlled purchases where the defendant was able to produce heroin within a short time after receiving a call from a confidential informant. *Id.* at 557. In addition, the affidavit established the defendant's connection to the premises, as he twice left the premises and went directly to the drug sale and, on a third occasion, was seen returning to the premises after the drug sale.

¶ 55    Similarly, the affidavit in *Holmes* set forth the affiant's extensive experience and expertise in the detection and investigation of controlled dangerous substances offenses. Specifically, the affiant stated that, in his experience, "he knew drug traffickers often maintain large amounts of money at their residence in order to finance their operations, as well as drugs, paraphernalia, weapons, and various books, records, and other documents relating to the ordering, transportation and distribution of controlled dangerous substances." *Holmes*, 796 A.2d at 98.

¶ 56    In *Garcia-Villalba*, the affidavit began by listing the Drug Enforcement Agency agent's professional and personal experience with the investigation. The agent asserted that " '[p]ersons involved in drug trafficking conceal in their residences and businesses caches of drugs.' " *Garcia-Villalba*, 585 F.3d at 1233. The agent's affidavit then spent 10 pages discussing the information obtained through electronic surveillance, including the determination that the premises to be searched was being used as a "stash house." *Id.*

¶ 57    The affidavit in support of a search warrant in *Saine* also included information from the affiant detective concerning his experience as a police officer generally, as well as his specific experience as a federal narcotics task force officer and a narcotics detective. The affiant noted that, during his tenure, he "had observed that drug dealers are known to hide their drugs, the proceeds of drug sales, and financial records related to their business in secure locations 'such as their … residences … or other locations which they control.' " *Saine*, 297 S.W.3d at 203.

¶ 58    In *Sowers*, the affidavit for a search warrant to search the defendant's residence included the statement:

> " 'It is this affiants [*sic*] experience that Marijuana and Cocaine can easily be hidden inside of a residence. It is also this affiants [*sic*] experience that persons involved in using and Distributing narcotics will not always take everything they have with them when they travel. It is also this affiants [*sic*] experience that narcotics and the paraphernalia Associated with the use of Narcotics are often hidden inside the user's residence for safe keeping.' " 643 S.E.2d at 508.

¶ 59    Similarly, in *Aguirre*, the affidavit for a search warrant recited that the defendant was under surveillance by the Drug Enforcement Agency and had been arrested for carrying " 'substantial amounts of cocaine' " and marijuana in his vehicle immediately after leaving his residence. 664 F.3d at 613. The affidavit also stated that the affiant's "experience as an investigator confirmed that drug dealers are likely to keep records of their trafficking activities in their homes." *Id.*

¶ 60    In contrast to the cases cited by the State, Officer Harrison's sworn statement in this case fails to describe his experience with drug investigations and arrests, instead stating only that Officer Harrison was a member of the Joliet Police Department for the past 10 years and was currently assigned to the narcotics unit. Officer Harrison does not describe drug distribution techniques, or habits of drug dealers, that might support an inference that Casillas stored his drugs and tools of the drug trade at defendant's home. Aside from the three sales to Officer Harrison, there was no evidence that Casillas was an established drug dealer with an ongoing, regular trade or whether the amount of drugs sold to Officer Harrison was consistent with personal use. Although the State correctly argues that an affidavit for a search warrant should not be judged based upon what it does not include, Officer Harrison's sworn statement in this case entirely failed to provide any evidence connecting defendant's home to the items to be

searched.[4] Rather, the sworn statement broadly concludes that the evidence sought will be found at defendant's house, without providing any basis sufficient to establish probable cause for that conclusion.

¶ 61        Although we have addressed the various inferences suggested by the State individually, we do not suggest that each factual matter in an affidavit for a search warrant must establish probable cause in order for a court to find probable cause. As discussed, this court applies a totality of the circumstances test to review whether the information before the magistrate was sufficient to find probable cause. In this case, however, the totality of the circumstances fails to establish a nexus between Casillas's drug deals and defendant's home. The magistrate had no substantial basis to conclude that probable cause existed to believe that evidence of the crimes of unlawful possession of a controlled substance and unlawful possession of a controlled substance with the intent to deliver would be found in a search of 701 West Marion Street. For that reason, the search warrant in this case was not supported by probable cause and was thereby invalid. The trial court's finding, that it was reasonable to infer that there was a fair probability that drugs would be found at defendant's home because Casillas was seen leaving defendant's house before the third drug buy, was against the manifest weight of the evidence. The appellate court thus erred in affirming the trial court's order denying defendant's motion to suppress.

¶ 62        Our inquiry does not end there, however. Although the fourth amendment protects the right to be free from " 'unreasonable searches and seizures,' " it is silent concerning how that right is to be enforced. *Davis v. United States*, 564 U.S. 229, 231 (2011) (quoting U.S. Const., amend. IV). The United States Supreme Court therefore created the exclusionary rule, which is a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a fourth amendment violation. *Id.* at 231-32. Exclusion, however, is " 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Id.* at 236 (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). Rather, the exclusionary rule's sole purpose is to deter further fourth amendment violations. *Id.* at 236-37. Accordingly, operation of the rule has been limited to situations in which the deterrent purpose is "thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348 (1974). Exclusion exacts a heavy toll on both the judicial system and society at large, as exclusion "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Davis*, 564 U.S. at 237. Moreover, the bottom line effect of exclusion, in many cases, "is to suppress the truth and set the criminal loose in the community without punishment." *Id.* Consequently, exclusion should be used only when the deterrence benefits of suppression outweigh the heavy costs. *Id.* As the *Davis* Court recognized, beginning in *United States v. Leon*, 468 U.S. 897 (1984), the United States Supreme Court "recalibrated our cost-benefit analysis in exclusion cases to focus the inquiry on the 'flagrancy of the police misconduct' at issue." *Davis*, 564 U.S. at 238 (quoting *Leon*, 468 U.S. at 911).

---

[4]In so holding we emphasize that our decision does not thereby find that the opinion of a law enforcement officer, standing alone, may provide the necessary nexus between the place to be searched and the evidence sought. That issue is not before us. We note that the federal courts are divided on the issue. See *United States v. Feliz*, 20 F. Supp. 2d 97, 103 (D. Me. 1998) (noting the divide in the federal courts).

- 14 -

¶ 63    The Court in *Leon* recognized a good faith exception to the exclusionary rule, holding that exclusion of evidence was not required where a police officer acted in objectively reasonable reliance on a facially valid warrant that was later found invalid based upon a lack of probable cause. This court adopted the *Leon* good faith exception in *Stewart*, 104 Ill. 2d at 477. The good faith exception has also been codified in sections 114-12(b)(1) and (b)(2) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-12(b)(1), (b)(2) (West 2008)). Section 114-12(b)(1) provides that a court should not suppress otherwise admissible evidence if a police officer seized that evidence in good faith. Section 114-12(b)(2)(i) defines good faith:

> "(2) 'Good faith' means whenever a peace officer obtains evidence:
>
> (i) pursuant to a search or an arrest warrant obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the officer reasonably believed the warrant to be valid ***." *Id.* § 114-12(b)(2)(i).

¶ 64    The deterrent benefit of suppression must outweigh the " 'substantial social costs,' " in order for exclusion of the evidence to apply. *People v. LeFlore*, 2015 IL 116799, ¶ 23 (quoting *Leon*, 468 U.S. at 907). *Leon* recognized four situations where the suppression of evidence would be appropriate. The first is where "the magistrate or judge in issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923. The second instance is "where the issuing magistrate wholly abandoned his judicial role." *Id.* Third, the good faith exception would not apply if a warrant was "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' " that an officer could not manifest objective good faith in relying on such a warrant. *Id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part, joined by Rehnquist, J.)). With regard to the third situation, *Leon* explained that an officer could not "obtain a warrant on the basis of a 'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search." *Id.* at 923 n.24. Finally, *Leon* held that, depending on the circumstances of the case, a warrant might be so facially deficient, as in failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid. *Id.* at 923.

¶ 65    Defendant argues that the State cannot meet its burden to show that this court should apply the good faith exception here. Defendant contends that the third *Leon* situation is present in this case because Officer Harrison's sworn complaint was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Defendant maintains that Officer Harrison's complaint was a "bare bones" affidavit, so that the officers' reliance on the affidavit was objectively unreasonable.

¶ 66    The State denies that the complaint was "bare bones," claiming the sworn complaint cited multiple pieces of evidence tying Casillas and his drug-selling activity to 701 West Marion Street, based both upon direct observation and related reasonable inferences. The State further notes that the threshold for demonstrating that the good faith exception should not be applied is a high one, as evidenced by the fact that the magistrate, the circuit court judge, and two of three appellate court justices concluded that the warrant affidavit provided probable cause to

justify the search of 701 West Marion Street. Consequently, if the search of 701 West Marion Street was invalid, the good faith exception to the exclusionary rule should apply.

¶ 67    Whether the good faith exception to the exclusionary rule applies presents a legal question that we review *de novo*. This court has not directly addressed the issue of whether an affidavit was a "bare bones" affidavit for purposes of a good faith analysis. In defining a bare-bones affidavit, we find the decision in *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017), instructive. There, the court explained that a bare-bones affidavit is "one that states only 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.' " *Id.* (quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005)). Stated otherwise:

> "a bare-bones affidavit is a conclusory affidavit, one that asserts 'only the affiant's belief that probable cause existed.' [Citation.] It provides nothing more than a mere 'guess that contraband or evidence of a crime would be found' [citation], either 'completely devoid' of facts to support the affiant's judgment that probable cause exists [citation], or 'so vague as to be conclusory or meaningless.' [Citation.]" *Id.*

¶ 68    *White* further explained that a bare-bones affidavit should not be confused with one that lacks probable cause. Rather, it must be so lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, no reasonable officer would rely on the warrant. *Id.* at 497. Thus, an affidavit should be judged for purposes of the good faith exception under a less demanding showing than the substantial basis threshold required to prove the existence of probable cause. *Laughton*, 409 F.3d at 748. That is because, if good faith reliance were judged by the substantial basis standard, the good faith exception would be devoid of substance. *Id.* at 749.

¶ 69    Keeping in mind that exclusion is a "bitter pill" that is to be used only as a " 'last resort' " (*Davis*, 564 U.S. at 237 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006))), we nonetheless find that the affidavit in this case was bare-bones and failed to establish the required minimal nexus between defendant's home and the items sought in the search warrant. The police officers could not have acted with an objectively reasonable good faith belief that their conduct was lawful in executing the search warrant on defendant's residence. The statements in the complaint—that Casillas drove a vehicle registered to 701 West Marion Street to one drug deal and 19 days later walked to another drug deal from 701 West Marion Street— are completely devoid of facts to support Officer Harrison's judgment that probable cause to search defendant's home existed. There are no facts directly connecting defendant's residence with Casillas's drug dealing activity, nor does the complaint for a search warrant create an inference connecting the drug dealing to defendant's home. The complaint for a search warrant is conclusory, asserting only Officer Harrison's belief that probable cause existed. We find that the facts stated in the complaint and the inferences to be draw therefrom were so lacking in indicia of probable cause as to render official belief in the existence of probable cause entirely unreasonable.

¶ 70    As noted, "[d]ecisions involving the exclusionary rule and the Illinois Constitution's article I, section 6, require that we carefully balance the legitimate aim of law enforcement against the right of our citizens to be free from unreasonable governmental intrusion." *Tisler*, 103 Ill. 2d at 245. We also recognize that "suppression of evidence obtained pursuant to a warrant

should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon*, 468 U.S. at 918.

¶ 71 This is such an unusual case. The right of citizens to be free from unreasonable governmental intrusion into their homes prevails over the legitimate aims of law enforcement under the facts of this case. The purpose of the exclusionary rule, to deter police misconduct, has application here. We decline to sanction the search of a third party's home based solely on the fact that an individual was seen leaving that home to go to one drug deal and arrived at another drug deal 19 days earlier driving a vehicle registered to that home. To hold otherwise would undermine the express protections accorded a citizen's home under the United States and Illinois Constitutions.

¶ 72 Because we find that the complaint for a search warrant in this case amounted to a bare-bones affidavit, we find that the good faith exception to the exclusionary rule does not apply in this case. The trial court therefore erred in denying defendant's motion to quash, and the appellate court erred in affirming the trial court's order.

¶ 73 For all the foregoing reasons, we reverse the appellate court's order affirming the trial court's order denying defendant's motion to quash the search warrant and suppress evidence, and we reverse the trial court's order on defendant's motion to quash and suppress as well. In light of our decision reversing the trial court's order on defendant's motion to quash and suppress, we also reverse defendant's conviction for unlawful possession of a weapon by a felon and remand the case to the trial court for further proceedings.

¶ 74 Judgments reversed.

¶ 75 Cause remanded.

¶ 76 JUSTICE GARMAN, dissenting:

¶ 77 The majority concludes that Officer Harrison's affidavit in support of the warrant to search defendant Jorge Manzo's residence did not provide probable cause and that the affidavit was so deficient that no reasonable officer could rely on it. I disagree with both conclusions. I respectfully dissent.

¶ 78                                                1. Probable Cause

¶ 79 The first question is whether the warrant to search 701 West Marion Street was supported by probable cause. Probable cause requires only that the evidence "was sufficient to warrant a person of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched." *People v. Griffin*, 178 Ill. 2d 65, 77 (1997). This depends on "the 'totality of the circumstances and facts known to the officers and court when the warrant was applied for.' " *People v. Tisler*, 103 Ill. 2d 226, 236 (1984) (quoting *People v. Free*, 94 Ill. 2d 378, 400 (1983)).

¶ 80 The majority rightly quotes the United States Supreme Court's explanation in *Illinois v. Gates* that "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

¶ 81    For a court reviewing a magistrate's probable cause determination, the inquiry is limited even further. Rather than evaluating the evidence anew, we ask only whether the magistrate judge had a "substantial basis" for concluding that probable cause existed. *Id.* at 238-39; *People v. McCarty*, 223 Ill. 2d 109, 153 (2006). Additionally, " 'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' " *People v. Stewart*, 104 Ill. 2d 463, 477 (1984) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

¶ 82    Although the majority dutifully recites these principles, it disregards them in its analysis of the facts of this case. Instead, the majority assumes that, because innocent explanations of the officers' observations were possible, those officers must have lacked probable cause. But the possible situations that the majority imagines were highly unlikely, and the officers were justified in assuming the more likely scenario was that Casillas had stored drugs at 701 West Marion Street.

¶ 83    Officer Harrison's affidavit provided a narrative of his undercover investigation that demonstrates why his inferences were reasonable. His affidavit explained that on May 20, 2009, he contacted Casillas to procure cocaine and Casillas agreed to a sale. Casillas arrived at the sale location in a vehicle registered to Leticia Hernandez at 701 West Marion Street. At this point, Officer Harrison had a reason to investigate that address.

¶ 84    Eleven days later, Officer Harrison contacted Casillas to procure cocaine, and again Casillas provided it. This time the meeting was closer to 701 West Marion Street. Because Casillas arrived at the sale with a small quantity of drugs, it is reasonable to infer that he may have stored drugs somewhere near the sale location. The Marion Street residence was a plausible candidate at this point. Certainly, Casillas might simply have borrowed a friend's vehicle, and the address associated with that vehicle may have been unrelated to Casillas's drug dealing. At this point, Casillas's use of Hernandez's vehicle on this occasion alone did not provide a sufficient connection to Hernandez's and defendant's home to justify a search warrant. Recognizing this, Officer Harrison continued investigating before applying for a search warrant.

¶ 85    However, for a third time in less than three weeks, Harrison contacted Casillas to procure cocaine. For the third time, Casillas provided cocaine on the same day that Harrison contacted him.[5] Contrary to the majority's analysis, Casillas was not an "occasional" seller. *Supra* ¶¶ 51, 60. In *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006), which the majority cites for this characterization, the officers observed only one drug transaction between an informant and the suspect. Here Officer Harrison solicited cocaine directly from Casillas on three separate occasions, and Casillas was consistently able to provide cocaine at a moment's notice. Furthermore, unless his only customers were these three undercover officers, Casillas likely sold cocaine more frequently than once a week. Such an inference might be inappropriate

_____

[5]This is the timeline as the State presents it, and the majority does not challenge it. The affidavit itself clearly conveys that the third drug transaction occurred on the same day that Harrison texted Casillas. The affidavit does not explicitly state that the first two transactions occurred on the same days that Harrison contacted Casillas. However, a paragraph that begins "On 5/20/09" describes the first phone call and meeting. A paragraph that begins "On 5/28/09" describes the second set of communications and the meeting. From this the magistrate judge could infer the timeline.

during trial, but it is just the sort of inference that police conducting an investigation could consider.

¶ 86 Seeking the location of Casillas's stash and following up on their lead, Officers Prochaska and Simonich camped outside 701 West Marion Street while Officer Harrison contacted Casillas. After Harrison requested cocaine from Casillas, Officer Simonich saw Casillas emerge from 701 West Marion Street, and Officer Prochaska followed him as he walked to the sale location. From this, police inferred that the house likely contained Casillas's stash of cocaine.

¶ 87 The majority proposes instead that Casillas had simply been visiting a friend and that "Casillas had the drugs on his person when he arrived at defendant's home." *Supra* ¶ 48. Perhaps it is possible that Casillas carried cocaine to his friend's house in case someone else contacted him asking for drugs. However, it is far more likely that Casillas had a ready supply of cocaine at 701 West Marion Street, because police found him at that residence—the same residence registered to the vehicle that Casillas drove to a drug sale a few weeks prior—at the same time that Officer Harrison contacted him to procure cocaine, and Casillas travelled from that residence to the sale location. I submit that these are common-sense inferences. Magistrate judges, however, may rely on " ' "common-sense conclusions about human behavior" ' " when making probable cause determinations. *District of Columbia v. Wesby*, 583 U.S. ___, ___, 138 S. Ct. 577, 587 (2018) (quoting *Gates*, 462 U.S. at 231, quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

¶ 88 The majority faults the affidavit for lacking the contextual background contained in the warrant applications from cases such as *Commonwealth v. Clagon*, 987 N.E.2d 554, 555-56 (Mass. 2013), *United States v. Garcia-Villalba*, 585 F.3d 1223, 1233 (9th Cir. 2009), *State v. Saine*, 297 S.W.3d 199, 203 (Tenn. 2009), *United States v. Aguirre*, 664 F.3d 606, 613 (5th Cir. 2011), and *Sowers v. Commonwealth*, 643 S.E.2d 506, 508 (Va. Ct. App. 2007). *Supra* ¶¶ 54-59. However, the sort of information that the majority demands actually contributed little to the warrant applications in those cases. Those affidavits contained such generic remarks as " 'drug dealers are known to hide their drugs, the proceeds of drug sales, and financial records related to their business in secure locations "such as their *** residences *** or other locations which they control." ' " *Saine*, 297 S.W.3d at 203. Similarly, in *Sowers*, the officer submitted an affidavit stating it was his " 'experience that Marijuana and Cocaine can easily be hidden inside of a residence.' " 643 S.E.2d at 508. I would not fault Officer Harrison for declining to include such general statements in his affidavit. His 10 years as a police officer likely taught him that criminals store contraband in secure locations, and the magistrate judge was surely aware of cocaine's capacity to be hidden in houses. Although officers' experiences may show that drug dealers often keep drugs in either their homes or other secure locations, I would not require officers to fill their affidavits with trivial and uninformative generalities such as this.

¶ 89 Throughout its opinion, the majority notes that police were investigating Casillas's drug dealing, not Hernandez or defendant. *Supra* ¶¶ 39, 44. This is not decisive. The United States Supreme Court explained in *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978), that the "critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." See also *Ganek v. Leibowitz*, 874 F.3d 73, 86 (2d Cir. 2017); *United States v. Adams*, 655 F. App'x 312, 317 (6th Cir. 2016).

- 19 -

The question is not whether police had probable cause to suspect that Jorge Manzo had committed a crime and stored evidence in his home. The question is whether they had probable cause to believe that 701 West Marion Street contained evidence of Casillas's drug dealing.

¶ 90 Another error that pervades the majority's analysis is its tendency to isolate each fact and provide an innocent explanation for that fact. This is not how courts determine probable cause, however. Instead we look at the totality of the circumstances. See *Florida v. Harris*, 568 U.S. 237, 244 (2013) (rejecting "rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach" to probable cause determinations); *Gates*, 462 U.S. at 230. Considered separately, each transaction would not provide a sufficient connection between Casillas's illegal activities and 701 West Marion Street. Together, however, the frequency and readiness with which Casillas delivered cocaine, his use of the vehicle registered to 701 West Marion Street, his presence at that address at the exact time that Harrison solicited cocaine, and his subsequent walk from that address to the sale location suggest that he stored drugs in that building.

¶ 91 The majority emphasizes the importance of the home as a place that is protected from government interference. *Supra* ¶ 35; *Payton v. New York*, 445 U.S. 573, 585 (1980); *People v. Burns*, 2016 IL 118973, ¶ 24. No one is questioning that premise. What we are to consider, however, as a reviewing court, is whether the magistrate judge had a substantial basis for concluding that Officer Harrison's affidavit provided probable cause—a standard that is lower even than the preponderance of the evidence standard. Based on the evidence in the affidavit, the magistrate's conclusion that it was fairly likely that police would find evidence of drug dealing at 701 West Marion Street is justified.

¶ 92                                    2. The Good Faith Exception

¶ 93 Even if one concludes that the affidavit was insufficient, however, the majority's conclusion that the "good faith" exception to the exclusionary rule does not apply is clearly wrong.

¶ 94 Both the United States Supreme Court and Illinois's Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/100-1 *et seq.* (West 2008)) allow evidence obtained pursuant to a warrant to be admitted in court even if the court concludes that the warrant was not supported by probable cause, as long as the officers executing the warrant relied on it in good faith. *United States v. Leon*, 468 U.S. 897, 923 (1984); 725 ILCS 5/114-12(b)(1) (West 2008). This "good faith" exception has a few exceptions of its own. The majority finds that the evidence here was inadmissible because Officer Harrison's affidavit was " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " *Leon*, 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975)). The majority repeats *Leon*'s statement that officers may not "obtain a warrant on the basis of a 'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search." *Id.* at 923 n.24.

¶ 95 The majority relies on *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017), for its characterization of a "bare bones" affidavit as one that is " 'completely devoid' of facts to support the affiant's judgment *** or 'so vague as to be conclusory or meaningless.' " *Id.* (quoting *United States v. Carpenter*, 360 F.3d 591, 595-96 (6th Cir. 2004) (*en banc*), and *United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005)). In *White*, however, the court also

explained that "an affidavit is not bare bones if, although falling short of the probable-cause standard, it contains 'a minimally sufficient nexus between the illegal activity and the place to be searched.' [Citation.] If the reviewing court is 'able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been'—'some modicum of evidence, however slight'—'between the criminal activity at issue and the place to be searched,' then the affidavit is not bare bones and official reliance on it is reasonable. [Citation.]" (Emphasis in original.) *Id.* at 496-97.

¶ 96    Notably, the *White* court concluded that the affidavit in that case was not "bare bones," and it upheld the conviction. The affidavit under review reported two key facts: an informant told police that someone sold marijuana out of a particular building, and on one occasion police observed a confidential informant purchase marijuana from a suspect in that building's driveway. The *White* court concluded that this information established the minimally sufficient nexus to the residence to satisfy the good faith exception. Here we have far more specificity, including multiple cocaine sales within a few weeks, direct observation of a suspect leaving the residence and walking to a sale, and a vehicle registered to that address, which the suspect used to travel to another sale.

¶ 97    *White* cited *Nathanson v. United States*, 290 U.S. 41 (1933), and *Aguilar v. Texas*, 378 U.S. 108 (1964), as "prototypical examples of *Leon*'s bare-bones affidavit." *White*, 874 F.3d at 498; see also *Leon*, 468 U.S. at 915. The officer in *Nathanson* stated in his affidavit only that " 'he has cause to suspect and does believe that' " liquor illegally brought into the United States " 'is now deposited and contained within the premises' " subject to the search. 290 U.S. at 44. The affiants in *Aguilar* reported that they had " 'received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law.' " 378 U.S. at 109; see *White*, 874 F.3d at 498-99.

¶ 98    The affidavit in this case contains more evidence than the affidavit in *White* and far more than the "prototypical" bare-bones affidavits from *Nathanson* and *Aguilar*. Officer Harrison described a three-week investigation in which he personally purchased cocaine from Casillas on three separate occasions. He first connected Casillas's drug dealing to 701 West Marion Street through the vehicle registered to that address and pursued that lead with the assistance of two other officers. Those officers witnessed Casillas travel from 701 West Marion Street to a drug deal soon after Harrison contacted him. This certainly qualifies as at least " 'some modicum of evidence,' " which is sufficient to satisfy the requirements of the good faith exception. *White*, 874 F.3d at 497.

¶ 99    The same conclusion follows from a consideration of the Illinois statutory provision on the good faith exception. Section 114-12(b) of the Code codified this exception to the exclusionary rule. It defines "good faith" as

    "whenever a peace officer obtains evidence:

        (i) pursuant to a search or an arrest warrant obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the officer reasonably believed the warrant to be valid[.]" 725 ILCS 5/114-12(b)(2)(i) (West 2008).

¶ 100    The majority here does not suggest that the warrant contained any deliberate errors or material misrepresentations, nor does it suggest that the magistrate was biased. Instead it concludes that the officers could not "reasonably" have believed that the warrant was valid. As the above discussion demonstrates, however, Officer Harrison's affidavit was well within the bounds that courts have set for good faith reliance on a warrant application.

¶ 101    I would find that Officer Harrison's affidavit provided probable cause to search 701 West Marion Street or, if not, that the "good faith" exception is satisfied here. Therefore, I respectfully dissent.

¶ 102    CHIEF JUSTICE KARMEIER and JUSTICE BURKE join in this dissent.